Evelyn FALKOWSKI, Plaintiff,

v.

Lowell PERRY, Chairman of the Equal Employment Opportunity Commission, et al.

Bertram N. PERRY, Plaintiff,

v.

Alvin GOLUB et al.

Civ. A. Nos. 76–G–0545–S, 75–G–1476–S.

United States District Court,
N. D. Alabama, S. D.

Nov. 21, 1978.

Edward Still, Birmingham, Ala., Margaret Beller, Washington, D. C., for plaintiff Falkowski.

William F. Gardner, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for plaintiff Perry.

John J. Pagano, Equal Employment Opportunity Commission, Washington, D. C., for EEOC.

## MEMORANDUM OPINION

GUIN, District Judge.

These consolidated cases are before the court on defendants' amended petitions for approval to propose to the Civil Service Board that adverse action be taken against plaintiffs. Plaintiff Falkowski is the Director of the Birmingham District Office of the Equal Employment Opportunity Commission (BIDO). Plaintiff Perry is the Deputy Director of that office. Defendants are officials of the Equal Employment Opportunity Commission (EEOC).

Mrs. Falkowski, before November 4, 1974, was the District Director of the Jackson, Mississippi, District Office. Unable to get a lateral transfer to Birmingham, she filed suit against her employer, alleging sex discrimination. That case was amicably settled, the EEOC agreeing to give serious consideration to Mrs. Falkowski's application for transfer, and a consent decree consistent with the agreement was entered. As a result of that agreement and the consent decree, Mrs. Falkowski was, on November 4, 1974, transferred to her present position as District Director of the BIDO.

The peace thus made was short lived. On April 19, 1976, Mrs. Falkowski filed the present action alleging that defendants had failed to abide by the consent decree and were retaliating against her for bringing the prior action, by failing to give her the administrative support that she required to run the BIDO effectively. By this court's order and an amendment thereto, the complaint was dismissed without prejudice, the court retaining jurisdiction of the case so that any proposal to remove Mrs. Falkowski from her position must be approved upon petition to this court.

Mr. Perry has been with the BIDO since 1968 and has been Deputy Director of that office since 1972. On August 15, 1975, Mr. Perry received notice that he was being "detailed" to Washington, D.C., effective

August 25, 1975, ten days later. He then brought this action on August 18, 1975, seeking to enjoin the detail. At the preliminary injunction hearing, he established that the "detail" was initiated largely as a result of the EEOC's attempts to suppress his continual and outspoken protests of the BIDO's mismanagement, made to the Regional Director, the U. S. Attorney, and members of the public. The proposed "detail" was found to be, in reality, a transfer from the BIDO. Mr. Perry would have worked in Washington temporarily, but would have returned to work in an office other than the BIDO. Accordingly, this court issued a preliminary injunction prohibiting defendants from removing Mr. Perry from his position. *Perry v. Golub,* 400 F.Supp. 409 (N.D.Ala.1975).

Before the case was tried, defendants petitioned for dissolution of the preliminary injunction and for permission to process adverse action against Mr. Perry. The petition was stricken for defendants' failure to comply with discovery orders. The preliminary injunction, however, was dissolved because there was no reason for its continued effect, there then being no attempt to transfer Mr. Perry. The court retained jurisdiction of the case to protect Mr. Perry from retaliation to the extent that any attempt to remove Mr. Perry from his position must be approved upon petition to this court. *Perry v. Golub,* 74 F.R.D. 360 (N.D. Ala.1976).

On November 7, 1977, the defendants filed petitions to proceed against both plaintiffs before the Civil Service Board, there to seek their removal. Defendants later amended their petitions to pray for permission to seek plaintiffs' mere transfers to Washington to jobs with less prestige and responsibility but with the same pay. The issue before the court in both cases, thus, is whether the proposed adverse actions are motivated by retaliation.

The present actions are the culmination of a long-standing feud between Mrs. Falkowski and Mr. Perry. For almost four years, they have cursed, slandered, pushed, backbitten, and thrown wads of paper at one another. They have quarreled frequently in the presence of the public, charging parties, and employees of the BIDO.

The proposed notice of Mr. Perry's removal enumerates six reasons and sixteen specifications; that of Mrs. Falkowski's removal, twelve reasons and forty-one specifications. The charges against Mr. Perry are based principally upon his feuding with Mrs. Falkowski. The charges against Mrs. Falkowski are based upon her feuding with Mr. Perry and on her mismanagement of the BIDO.

Both plaintiffs are charged with improprieties regarding two principal confrontations. One occurred about 4:20 P.M. on July 18, 1977; the other at about 2:00 P.M. on October 17 of that year.

Mr. Perry had, on July 15, 1977, reprimanded an employee. On July 18, Mrs. Falkowski had a letter to Mr. Perry typed up criticizing his reprimand and left the letter on her desk during the day in a sealed envelope with his name on it. That afternoon, Mr. Perry saw the envelope and inquired as to its contents. Mrs. Falkowski refused to let him see it until shortly before 4:20 P.M., when she delivered it to his secretary. Upon reading the letter, Mr. Perry, as expected, lost his temper. Anticipating Mr. Perry's outrage,[1] and in need of material on which to base an adverse action proceeding against Mr. Perry, Mrs. Falkowski returned to her office, turned on a tape recorder concealed in her purse, and awaited the angry Perry's arrival.

She did not wait long. Mr. Perry, as anticipated, burst into Mrs. Falkowski's office, uttering a scream of obscenities that would curl a sailor's hair. During the confrontation, an employee approached Mrs. Falkowski's office and was ordered away by Mr. Perry. The verbal affray finally ended upon the arrival of the building security guard.

Mr. Perry is charged with using abusive language towards Mrs. Falkowski, engaging in the altercation, and usurping Mrs. Fal-

---

1. (Understandable and justified, under all the circumstances, in the court's opinion.)

kowski's authority in ordering the employee away from her office. Mrs. Falkowski is charged with provoking Mr. Perry into the exchange, and with recording the altercation without Mr. Perry's permission, in violation of EEOC Order No. 165, Paragraph 6(b).[2]

On October 17, 1977, Mr. Perry and some other employees were "sanitizing" copies of EEOC records, marking out and making illegible the names of charging parties before the copies were delivered to a party to a lawsuit, in compliance with discovery rules.

Mrs. Falkowski entered the office, assumed that Mr. Perry and the other employees were marking out names on the original records, and went into hysterics. Mr. Perry tried to explain to her that the documents were not originals, but was unable to do so. Mrs. Falkowski ordered the employees to stop marking out names and attempted to collect the records from the employees' desks. Mr. Perry instructed the employees to continue the sanitizing, countermanding Mrs. Falkowski's instructions. Mrs. Falkowski went about collecting the copies and shouting, "I am in charge." She then told Mr. Pugh, a supervisor, that she was appointing him Acting Deputy Director.

Mr. Perry is charged, in connection with this incident, with unprofessional conduct in having participated in the exchange. Mrs. Falkowski, for her part, is charged with unprofessional conduct, poor judgment, and mismanagement.

On July 25, 1977, Mr. Jeffrey issued written warnings to Mr. Perry and Mrs. Falkowski. The grounds for Mr. Perry's warning were conduct prejudicial to the government, the use of abusive language, and

maintaining low morale. The grounds for Mrs. Falkowski's warning were conduct prejudicial to the government, indecisive leadership, poor management practices, poor judgment in communications, unwillingness or inability to interact or relate, and maintaining low morale.

Double punishment for the same offense is violative of the procedures set forth in the Federal Personnel Manual.[3] Under EEOC Order No. 572, revised September 20, 1976, a letter of warning is a form of discipline. Therefore, any activities made grounds for the July 25, 1977, letters of warning could not properly be made grounds for the proposed adverse actions.

Though, at one point, the Federal Personnel Manual apparently contemplates that letters of warning and adverse actions may be grounded upon the same offenses, the EEOC's practice has been not to subject its employees to double discipline. In fact, there is only one other case in which the EEOC has proposed adverse action on grounds previously made the basis of other discipline.[4] There, the Civil Service Commission refused to allow the employee to be subjected to double jeopardy.

Mr. Jeffrey was notified of the confrontation of July 18, 1977, on July 21, 1977. He did not, however, learn that Mrs. Falkowski had tape recorded the spat until mid-August. Mr. Perry was punished for his part in the July 18 incident by the July 25 letter of warning. Mrs. Falkowski was not, on the other hand, punished for tape recording the incident in violation of EEOC Order No. 165 by her July 25 letter. That letter did not purport to be based on her illicit recording, and Mr. Jeffrey was not even aware of the tape recording at the time he issued the letter.

---

**2.** *"Recording of statement made in person*: Manual vertaim transcripts or the use of electronic or mechanical recording devices in hearings, meetings, interviews, and conversations are authorized only when advance notification is given to all participants that the recording or transcription will occur."

**3.** Section S3–2b(1) of that document reads, in part: "Under the same reasoning, the Commis-

sion has found that agency adverse actions were not warranted where the employee had been previously disciplined for the same offense."

**4.** Clarence Weahkee, Federal Employee Appeals Authority, United States Civil Service Commission, Dallas Field Office, Dallas, Texas (Decision dated May 6, 1976).

All of the grounds of the proposed adverse action were also grounds for the July 25 letters of warning except, in Mr. Perry's case, those involving the October incident, and in Mrs. Falkowski's case, those arising from the October incident and her tape recording of the July 18 incident. These are the only grounds, therefore, on which adverse actions may be based.

The court finds that, though the decision to process adverse action against Mr. Perry was motivated by retaliation, the decision to proceed against Mrs. Falkowski was not retaliatory.

Mrs. Falkowski claims that the present proposal is in retaliation for bringing suit in 1974 to obtain a transfer to Birmingham and for bringing the present action.

■ Retaliation is made an unlawful employment practice by 42 U.S.C. § 2000e–3(a). To show that the proposed adverse action is improper, Mrs. Falkowski would have to show only that retaliation for engaging in protected activity was a factor in the decision to proceed against her. *United States v. Hayes International Corporation*, 7 E.P.D. ¶ 9164 (N.D.Ala.1973), affirmed per curiam 507 F.2d 1279 (5th Cir. 1975); EEOC Compliance Manual, Paragraph 491.5(4). To make out a prima facie case of retaliation, she must show that the attempted discipline followed protected activities of which her employer was aware, and, absent other evidence of retaliation, that the attempted discipline followed the protected activities closely enough in time to justify the inference of retaliatory motivation. The burden would then shift to the EEOC to show legitimate nondiscriminatory reasons for the discipline. *Aguirre v. Chula Vista Sanitary Service*, 542 F.2d 779 (9th Cir. 1976); *Grant v. Bethlehem Steel Corporation*, C.A.No. 76–Civ. 847 (S.D.N.Y.1977); *Hochstadt v. Worchester Foundation*, 425 F.Supp. 318 (D.Mass.1976).

■ Mrs. Falkowski failed to make out a prima facie case. Though she engaged in protected activity and was subsequently disciplined, the present adverse action did not so closely follow her protected activity as to justify an inference, without more, of causation. Neither has other evidence established a retaliatory motive. Mrs. Falkowski made much ado at the hearing about the EEOC's failure to process properly the numerous grievances she filed against Mr. Perry. The EEOC's shortcomings in this regard are a mere side issue, not evidence of retaliation. The agency acted, though not in accordance with its regulations, in an understandably human way which was not in the least retaliatory.

Even if Mrs. Falkowski had made out a prima facie case of retaliation, still she would not have prevailed. The reasons for the proposed adverse action are legitimate and nondiscriminatory. Tape recording Mr. Perry's outburst without his permission was a clear violation of EEOC Order No. 165. Though it may have been, at best, an attempt, born of desperation and conceived of righteousness, to trap her constant rival, it was yet a violation of agency regulations which the EEOC has the right to vindicate. Her behavior on October 17 is better characterized as the fit of a raving maniac than the reasonable reaction of a competent district office director to a reasonable mistake. Again, the EEOC has the right to censure such behavior, and its attempt to do so in the instant case is both legitimate and nondiscriminatory.

Mr. Perry's, on the other hand, is a different case. He claims that the present petition is in retaliation for his bringing this action and for his vocal objection to the BIDO's lack of management. The court agrees with him.

The only basis proposed for the adverse action against Mr. Perry which the EEOC could technically raise is his part in the October 17 sanitizing incident. This charge boils down to nothing. It is frightening to think that the Civil Service Board would discipline an employee for countermanding the orders of a wild, screaming woman in a fit of hysteria. The very frivolity of this charge bespeaks the improper motivation behind it.

■ During the hearing on the present petitions, an offer of proof was made of a

transcript of the July 18 tape recording, and the contents thereof. Mr. Perry objected to the introduction of the evidence, and the court reserved ruling on its admissibility. For two reasons, the court now holds that the evidence is irrelevant to Mr. Perry's case, and, therefore, inadmissible: first, the EEOC may not proceed against Mr. Perry for his part in the July 18 incident; and, second, even if the EEOC could proceed against Mr. Perry for his part in the July 18 incident, the tape recording and the fruits thereof would not be admissible at that hearing.

Mrs. Falkowski, in taping the conversation with the admitted purpose of obtaining evidence on which to base an adverse action against Mr. Perry, was acting in her capacity as agent for the EEOC and in clear violation of EEOC Order No. 165, Paragraph 6(b). The EEOC cannot take advantage of its own wrongdoing. The EEOC Compliance Manual, § 494.3, prohibits use, in its own case processing, of evidence obtained by improper means. This principle is a sound one from which the EEOC will not be allowed to deviate. The transcript would not be admissible against Mr. Perry at the administrative level, and is therefore irrelevant to this petition to proceed against him. *Knoll Associates, Inc. v. FTC*, 397 F.2d 530 (7th Cir. 1968); *EEOC v. Red Arrow*, 392 F.Supp. 64 (E.D.Mo.1974).

Defendants cite *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), for the general proposition that the taint of illegal procurement does not prevent evidence's admissibility in a civil setting. Though the *Janis* doctrine is undeniably the law, it has no application to the present proceedings. *Janis* upheld a tax assessment based on illegally seized evidence. The Supreme Court took pains to point out, however, that its holding was premised on the absence of federal participation in the seizure. In the present case, however, Mrs. Falkowski was acting in her capacity as agent for the EEOC, providing the essential element of federal participation. The doctrine that the federal government should not be permitted to avail itself of its own wrongdoing is yet good law.

The evidence is overwhelming that the proposed adverse action against Mr. Perry is in retaliation for the exercise of his first amendment rights.

Mr. Perry's obtaining the preliminary injunction in the instant case was an embarrassment to the EEOC, as well it should have been. Mr. Golub testified to that effect and to the effect that it was embarrassing to him personally.

The court is impressed by the similarity of the Commission's treatment of Mr. Perry and that of one Jim Nunes. Mr. Nunes conducted an audit of the EEOC in which he recommended the removal of Mr. Golub. Mr. Nunes was thereafter transferred from a field office to the Office of Systemic Programs in headquarters in Washington. Mr. Golub testified, with unmistakable satisfaction, that Mr. Nunes was a GS–14 before he was transferred and has not since been promoted. Ronald Dickerson, a supervisor in the Office of Government Employment in headquarters, testified, in deposition, that Mr. Golub stated that Mr. Perry was "aggressive or forward for a black man." Though Mr. Golub denied making the statement, the court finds the testimony of Mr. Dickerson the more credible. The court did not hear Dickerson personally, but did so hear the testimony of Golub.

The treatment Mr. Perry has received is typical of that of instances documented in "The Whistle Blowers" report. The report found that "employees who have exposed governmental waste and abuse have been fired, transferred, reprimanded, denied promotions, riffed, or harrassed through the misuse of formal discipline procedures."[5] Though Mr. Golub testified that he decided to remove himself from the BIDO situation, the evidence discloses that his removal was more apparent than real and raises the inference that it was he, or someone at his

---

5. *The Whistle Blowers—A Report on Federal Employees Who Disclose Acts of Governmental Waste, Abuse and Corruption*, page 1 (Senate Committee on Governmental Affairs, 95th Congress, 2nd Session, February 1978).

instance, who decided to process the instant adverse action against Mr. Perry, and that it was not Mr. Jeffrey as the defendants would have the court believe.

The decision to process the proposed adverse actions was based in large part upon the results of an investigation of the BIDO made by Mr. Krueger and Ms. Garcia. These two were selected by James Packwood and Cora Dixon, Mr. Golub's assistants. Mr. Packwood attended the Chicago meeting at which the Krueger-Garcia investigation was planned. Both Mr. Krueger and Ms. Garcia were advised of the proposed investigation by headquarters in Washington, not by Mr. Jeffrey. When the investigation was complete, the report was delivered to Mr. Jeffrey in Washington; both Packwood and Dixon were present at the delivery. Mr. Jeffrey testified that he read only the first of the four volumes comprising the report. Mr. Golub, on at least one occasion, personally called Mr. Krueger to inquire about the investigation. Mr. Golub later presided at the May 1978 meeting where the decision to propose a transfer instead of a removal was made. Mr. Jeffrey's file was devoid of drafts and other materials that would have been present had he drafted the proposed adverse action. Mr. Jeffrey even testified that he didn't know when the decision to discharge Mr. Perry was made and that the adverse action was typed in Washington prior to the October meeting at which Mr. Jeffrey learned of the decision to proceed against Mr. Perry. Further, it is undisputed that Mr. Golub issued instructions to personnel in headquarters not to inform Mr. Perry of the activities occurring there.

It is obvious that Mr. Jeffrey did not make the decision to proceed against Mr. Perry, and it is equally obvious that it was Mr. Golub who made the decision. The only plausible reason that defendants would try to hide the origin of the proposed adverse action is that it would be easier to hide the retaliatory motive behind it if it looked as if it had come from Mr. Jeffrey instead of Mr. Golub.

On February 25, 1977, Maxine Cade, the Director of the EEOC's own EEO office, issued a proposed disposition of Mr. Perry's complaints of discrimination and reprisal. The proposed disposition found that, while Mr. Perry had not been discriminated against on the basis of race or sex, he had been subjected to retaliation by the EEOC on account of his protests of mismanagement.[6]

If the EEOC were concerned, as the proposed adverse actions would indicate, with promoting the efficiency of the service, then it would, logically, have investigated the finding of retaliation further. Instead, the proposed decision was rescinded after what Mr. Golub's answers to interrogatories characterize as his "discussions among a group of persons." This was the first time in the history of the EEOC that a proposed decision was rescinded. In every prior case, the proposed decision was adopted as final. The Executive Director's Office's review of the decision was also novel. Despite the rescission, Ms. Cade, on September 30, 1977, adopted the proposed disposition as the agency's final decision under her authority as director of the office and pursuant to EEOC Order No. 577, which gives her such authority. The decision was final but a short while. On November 30, 1977, after Mr. Perry relied upon the finding of retaliation in defense of the present petition, headquarters withdrew the decision. De-

---

6. That proposed disposition contained the following language: "Much of your protests regarding the definition of your duties, the work assignments given you, and your concern about irregularities in the Birmingham District Office are valid and are recognized as such by the Equal Employment Opportunity Commission." * * * "The investigation and evidence of record shows that your protests resulted in a decision made by a person or several persons to remove you from your position as Deputy Director of the Birmingham Office." * * * "The investigation shows that adverse actions were taken and/or attempted against you because of your persistence in making known irregularities in the Birmingham District Office. Through your persistence you have brought into focus serious managerial problems which exist in the Birmingham District Office and you have attempted to avail yourself of remedies through official channels. As a result you have been subjected to many adverse actions."

spite the fact that the Civil Service Commission's regulations provide that an EEO complaint shall be processed before 180 days after it is filed,[7] Mr. Perry's case before the EEOC's EEO office remains, to this day, unresolved.

By EEOC Order No. 542, each employee is to be given an annual performance appraisal. Until Mr. Perry went to the United States Attorney complaining of the BIDO situation, he had received outstanding appraisals each year. From 1976 until November 1977, Mrs. Falkowski gave him no appraisal at all. The admitted reason for this violation of procedure was to withhold potential ammunition for the present proceedings.

One of the earmarks of retaliation is disparate treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); EEOC Compliance Manual § 495.3. It is obvious from a review of the EEOC's treatment of other cases of misconduct that the charges against Mr. Perry constitute excuses rather than reasons. The evidence revealed that gross incompetence and neglect of duty in the Memphis District Office was rewarded by promotions for three of the managers responsible. Destruction of records in the Chicago District Office to create the impression of a decreased backlog was ignored. The Krueger-Garcia report revealed instances of supervisor Charles Davis's misconduct, for which Mr. Davis received a mere "counseling memo." These included his shouting obscenities at Mrs. Falkowski, usurping her authority, refusing to communicate with Mrs. Falkowski, and his daring Mrs. Falkowski to do anything about his low productivity. Though Mr. Jeffrey grossly misstated his educational qualifications when he filled out his executive inventory for the EEOC, no action is proposed regarding his misconduct, and Mr. Golub even testified that Mr. Jeffrey had done nothing wrong.

Perry's Exhibit 28 reveals a fifteen-day suspension of a district director for failure to follow instructions, falsification of records, continued falsification of records after warning, and verbal abuse; a thirty-day suspension for falsification of time cards to the tune of $4,132.27; a thirty-day suspension for falsification of travel vouchers to the tune of $3,747.00; a one-day suspension for assaulting a supervisor, and so on.

The issue in a case of disparate treatment is not one of precise equivalence in culpability but of incidence of comparable seriousness attended by lesser discipline. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Clearly incidents at least comparable in seriousness to those with which Mr. Perry is charged have been met with much lighter discipline than that proposed against Mr. Perry. The disparate treatment indicative of retaliation is present in Mr. Perry's case.

The defendants' decision to seek a mere transfer instead of removal makes the proposed discipline no less retaliatory. Apparently there is little difference in substance between the proposed transfer and a removal. The EEOC would, if permitted, transfer Mr. Perry to the Office of Systemic Programs under the direct supervision of Mr. Golub. Mr. Perry's proposed job description was drafted after the defendants amended their petition to seek a transfer instead of removal. Mr. Golub was not even sure of the name of the position, referring to it at first as "equal opportunity specialist" and later as "equal employment officer." The job description referred to the position sometimes as "equal opportunity specialist" and sometimes as "special assistant." The duties which Mr. Perry would assume consist of reviewing consent decrees, and, as Mr. Golub added at the hearing, reviewing conciliation agreements. The function of the Office of Systemic Programs is to attack systems of discrimination. It is apparent that the duties thought up for Mr. Perry would be only tangential to the office's function.

The transfer would constitute a reduction in rank under the terms of the Federal

---

7. 29 C.F.R. § 713.220(a).

Personnel Manual because Mr. Perry would no longer be in a supervisory position. The EEOC would propose, thus, to waste Mr. Perry's talents in the name of promoting the efficiency of the service. What the EEOC does cannot be reconciled with what it says. It can be reconciled only with an underlying retaliatory motivation.

The office to which the EEOC proposes to send Mr. Perry is not matched to his abilities, but rather to his intolerance · of an inefficient Commission. The office is a depositary for dissidents, the Siberia of the jealous guardians of our civil rights. Jim Nunes, the man who recommended Mr. Golub's removal, was, thereafter, transferred to that office. Similarly, Mr. Perry would be going to work with Marvin Rogoff, an American Federation of Government Employees officer and outspoken critic of EEOC management. Certainly, Mr. Golub does not want these men under his direct supervision out of love for them. The logical inference is that he wants these people in positions where he can more easily silence them.

The evidence is overwhelming that the adverse action was proposed against Mr. Perry because of his protests of mismanagement and inefficiency, in violation of his right to speak freely. Further, it is clear that had Mr. Perry not exercised his rights to protest conditions in the EEOC, this petition would not have been filed. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Accordingly, the defendants' petition for permission to process adverse action against Mr. Perry is due to be denied.